RECEIPT # _____ 60369
AMOUNT $ 150
SUMMONS ISSUED X-3
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____ 11-24-04

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.

| | |
|---|---|
| BRENT E. WOODFIELD, M.D. and LISA W. WOODFIELD, Plaintiffs | ) ) ) |
| vs. | ) ) ) |
| UNITED STATES OF AMERICA, Defendant | ) ) ) ) |

**COMPLAINT**

**04 ᶜ 1 2 4 8 3 NMG**

MAGISTRATE JUDGE Cowley

## I. **INTRODUCTION**

This action arises under the Federal Tort Claims Act, Sections 2671 through 2680 of Title 28 of the United States Code (29 USCS §§ 2671-2680). As adduced in the Plaintiffs' originally submitted SF Standard Form 95 Claim (submitted on December 3, 2003) the Plaintiffs seek by this eight (8) Count suit to recover alleged property damage in the amount of Two Million One Hundred Forty-Three Thousand One Hundred Ninety-Eight Dollars and 30 Cents ($2,143,198.30) and personal injury damages of Nine Hundred Thousand Dollars ($900,000.00), or, total damages of Three Million Forty-Three Thousand One Hundred Ninety-Eight Dollars and 30 Cents ($900,000.00). Because as of June 3, 2003, or, at least six months after the submission of their Claim, the U.S. Department of Health and Human Services Office for Civil Rights of and for the City of Seattle, in the State of Washington, had neither accepted nor rejected the Plaintiffs' Claim, pursuant to 28 USCS §2675(a), the Plaintiffs herein elected to consider said failure to act as a final denial of their Claim and hereby institute this action to acquire full, fair

and reasonable compensation for their losses sustained.

## II. <u>PARTIES</u>

1.    The Plaintiffs, Dr. and Mrs. Woodfield, husband and wife since November 10, 1994, presently reside at 85 Arbutus Trail, Chatham, Town and County of Barnstable, Massachusetts.

2.    The Defendant, United States of America, by and through its U.S. Department of Health and Human Services and said Department's Offices for Civil Rights, and, specifically in this instance its Region X Seattle, Washington Office for Civil Rights (located at all material times hereto at 2201 Sixth Avenue, Suite 900, Mail Stop RX-11 in Seattle, Washington 98121) is charged by Federal Statute to investigate complaints brought before it by claimants such as Dr. Woodfield and Mrs. Woodfield in this instance, which complaints are based upon various statutorily recognized bases of discrimination, including but not limited to discrimination on the basis of disability in violation of the Americans with Disabilities Act of 1990 (hereinafter: "ADA"). In the case at bar, the U.S. Department of Health and Human Services (hereinafter: "DHHS") by and through its Region X Seattle, Washington Office for Civil Rights (hereinafter: "OCR") was responsible pursuant to both Federal statutes and regulations to investigate the Claim brought before it by Dr. Woodfield based upon alleged ADA discrimination against him by the Idaho State Board of Medicine (hereinafter: "ISBM") of Boise, Idaho. Accordingly, pursuant to applicable Federal statutes and regulations the DHHS – through its Region X OCR – had the exclusive obligation and responsibility by and through its personnel and representatives to investigate and make a final determination with respect

to the allegations brought before it by Dr. Woodfield and his wife. Accordingly, the prospect for the proper handling of the Woodfield's Claim and remedy and/or resolution provided therefor was within the exclusive control – in the first instance of said Region X DHHS OCR.

### III. JURISDICTION

3.    Jurisdiction of this Court is vested pursuant to Section 1346(b) of Title 28 of the United States Code (28 USCS § 1346(b)) and 28 U.S.C. 2671 et seq.

### IV. STATEMENT OF FACTS

4.    On or about June 4, 1997 the Plaintiff, Brent E. Woodfield, M.D. (hereinafter: "Dr. Woodfield") completed his last day of employment as an Obstetrician/Gynecologist (hereinafter: "OB/GYN") at the Carl Albert Indian Health Facility (hereinafter: "CAIHF"), 1001 North Country Club Road, Ada, Oklahoma. Dr. Woodfield's annual income at that time was approximately $251, 443.80 (See, Dr. Woodfield's W-2 for 1997 attached hereto and incorporated herein as Bates-stamped #1). With health insurance, medical malpractice insurance and "Prepaid Legal" said annual income aggregated to approximately no less than $300,000.00.

5.    On or about October 20, 1993 the DHHS, Region X, OCR acknowledged in writing its acceptance for investigation of Dr. Woodfield's Complaint of Alleged Discrimination by the ISBM alleging that said Board subjected Dr. Woodfield to discrimination on the basis of disability in violation of ADA (See, true copy of said October 20, 2993 acknowledgment correspondence appended at Bates # 23-26).

6.    One Victor Hidalgo (hereinafter: "Mr. Hidalgo"), the initial Region X OCR investigator

assigned to Dr. Woodfield's above-referenced Complaint, informed Dr. Woodfield in a phone conversation early in his OCR investigation that the OCR knew that Boards of Medicine "play dirty" but that it is sometimes hard to catch them at it.

7. As detailed herein, through their commissive and omissive negligence the final OCR "legal decision" issued by the OCR wrongfully cost Dr. Woodfield the loss of an invaluable career and devastated every aspect of Dr. Woodfield's and his wife's lives. The Woodfields had reasonably expected that said OCR would conduct a genuine investigation, prosecuted by competent, conscientious, honest individuals. Instead, virtually all Mr. Hidalgo ever wanted to discuss with Dr. Woodfield was his (Mr. Hidalgo's) imminent move back to New York City and his search for a new home. Mr. Hidalgo in the course of conversations related to Dr. Woodfield's case even asked Dr. Woodfield to send Mr. Hidalgo home sale listings. It was clear in Dr. Woodfield's dealing with Mr. Hidalgo that his mind and efforts were focused everywhere but upon the proper investigation of Dr. Woodfield's Claim. Thereafter, when another OCR investigator was assigned to Dr. Woodfield's case taking over from Mr. Hidalgo, one Dolores Braun (hereinafter: "Mrs. Braun"), Mrs. Braun clearly did no more than haphazardly piece together a final OCR "decision" patently based upon a clearly inadequate investigation, particularly in light of the serious allegations involved and the devastating impact of said allegations upon Dr. Woodfield's prospective medical career.

8. Said OCR was charged with the responsibility under the circumstances at bar to obtain all Dr. Woodfield's medical records directly from the original sources involved. OCR *de minimis* should have acquired all the original records pertaining to Dr. Woodfield from

the Oregon Board of Medical Examiners (OBME), the Holy Rosary Hospital in Ontario,

Oregon, and the Madison Memorial Hospital (MMH) of Rexburg, Idaho.

9.    OCR was charged with the fundamental responsibility of interviewing all (or at least

most) individuals with material knowledge involved in this matter at the aforesaid

facilities, rather than solely interviewing Dr. Woodfield and the ISBM Legal Counsel,

Ms. Jean Uranga (hereinafter: "Ms. Uranga") because there was (and still is at the time of

the filing of this action) a critical and substantial quantum of information which was

intentionally withheld from Dr. Woodfield which he cannot acquire, investigate or

evaluate and was not empowered to provide to the OCR – and he, Dr. Woodfield, had to

his great detriment to rely totally upon OCR to acquire same – which it did not.

10.    Furthermore, unlike in a court proceeding, Dr. Woodfield was not afforded rights of

discovery, and thus had and to this date prior to the filing of this suit has had no

independent ability to himself properly review the information OCR gathered and/or did

not gather, verify the accuracy of the same, and therefore have any viable basis upon

which to appraise the legitimacy of the OCR's final Letter of Findings ( hereinafter:

"LOF") which issued on September 23, 1994 (See, true copy of said LOF, appended at

Bates # 2-22).

11.    Said OCR LOF at its very outset negligently framed the "Issue Presented" stating:

> Whether the Idaho State Board of Medicine discriminated against the complainant
> on the basis of having a record of his disabilities (drug and alcohol addiction . . .
> (See, September 23, 1994, OCR LOF, page 1, paragraphs 3-4, Bates # 2).

In fact, it is evident that the "Issue Presented" *should have* been to the following effect:

"Whether the ISBM discriminated against the complainant (i.e., Dr Woodfield) given that

their actions/proceedings were based wholly upon their incorrect perception that Dr. Woodfield had a record of drug and alcohol addiction."

12. As Title II of the <u>Americans with Disabilities Act</u> (ADA) provides – inter alia:

Licenses, certificates, exams, and courses are evaluation mechanisms that traditionally have been applied to people with mental disabilities in discriminatory ways. Title II applies to public entities including state and local governments and their instrumentalities or agencies including entities empowered by the state to regulate professions. Consistent with prior federal legislation, the ADA also protects individuals who have a record of impairment or are regarded as having an impairment. These two prongs of the disability definition cover people under the act either if (1) they once had a mental disability and a record of that disability is used against them, or (2) it is erroneously presumed that they have a mental disability and that incorrect presumption is used against them. These two prongs are intended to protect people who may be victimized by myths, fears, and stereotypes about certain mental or physical conditions. As the US. Supreme Court has noted, erroneous assumptions and other inappropriate reactions to a disability may be as "handicapping" as the actual functional limitations of any given impairment. These misperceptions are especially common with mental disabilities.

13. Within the OCR's September 23, 1994 LOF in question, the words "alcohol/alcoholism" appear 9 times, the word "drug" appears 5 times and "addiction" is found 3 times. These terms were added to the list of "diagnoses" without explaining that though they were not accurate, the ISBM (by their attorney) perceived Dr. Woodfield to have had those diagnoses. Thus, the ISBM by and through their attorney, Ms. Uranga, misperceived and

incorrectly assumed Dr. Woodfield to have had or present said diagnoses. Even more

troubling is the fact that any purported bases for Ms. Uranga's deleterious mis-

characterizations were never illuminated in any fashion. There is no evidence as to who

told Ms. Uranga what – in a plainly inaccurate or misleading fashion – regarding Dr.

Woodfield and any problems he might or might not have – which "information" spurred

on the deliberate and unjustified course Ms. Uranga undertook to undermine Dr.

Woodfield.

14.   By proper investigation, the OCR could have facilely discovered the destructive course

undertaken by Ms. Uranga against Dr. Woodfield.

15.   Had OCR properly obtained Dr. Woodfield's medical records from the original sources

involved, as they had certainly led Dr. Woodfield to believe by and through their initial

October 20, 2993 letter accepting Dr. Woodfield's case for investigation and signed by

one Frank Martinez, Division Director of the OCR Region X (Seattle) (See, October 20,

1993 OCR letter accepting Dr. Woodfield's case for investigation attached hereto and

incorporated herein as Bates # 25 with which correspondence OCR sent release forms for

Dr. Woodfield to fill out and sign), OCR would have known and thereafter would and

should have made clear in its LOF that no diagnosis of any"addiction" was ever made

with respect to Dr. Woodfield. Said October 20, 1993 letter stated:

> In order to investigate your complaint, we will need the information listed below.
> Please provide the following information within ten (10) days from your receipt of
> this letter . . .
>
>> 3.   To obtain the medical data from your physician(s) and any other
>> medical services or treatment received for your disability, we will
>> need medical releases. Enclosed, please find ten (10) medical

> release forms that authorize our Office to receive, review or
> discuss your medical records as necessary to investigate your
> complaint. Please complete and sign them and return them to this
> office. (See, October 20, 1993, OCR letter accepting case for
> investigation, p. 3 at Bates # 25)

and further communicated that if he did not, they would not be able to do a proper

investigation:

> While your consent is voluntary, you should be aware that if we cannot gather the
> appropriate information in order to complete the investigation, your complaint
> may have to be administratively closed. (See, said October 20, 1993, OCR
> correspondence, p. 3 at Bates # 25)

16.    Reasonably relying upon the October 20, 2993 OCR correspondence, Dr. Woodfield

filled out, signed and submitted the provided release forms for his medical records and

specifically did not forward to OCR any copies of his medical records which he already

had because he expected and reasonably relied upon the representations of OCR pursuant

to said October 20, 1993 correspondence that OCR would definitely obtain his pertinent

medical records from all key, original sources involved.

17.    Instead, as only first discovered and confirmed by the Woodfields on December 7, 2001

(as explained in detail below), the only version of Dr. Woodfield's medical records

obtained and reviewed by OCR were those supplied by the ISBM, the entity under

investigation for discrimination on the basis of his "diagnoses." The Woodfields first

received written confirmation of this, in e-mails between Caroline Chang (temporary

Regional Director of OCR, Region X, Seattle, Washington), Victor Hidalgo and Maggie

Blackwell (Dr. Woodfield's contact with FOIA/Privacy Acts in Washington, D.C.), a

copy of which Maggie faxed to the Woodfields on December 7, 2001, in which Caroline

Chang wrote that when she questioned him, Mr. Hidalgo's recollection was that:

> all of the documents in the file came either from Mr. Woodfield or from the Idaho Board of Medicine. (See, true copy of said e-mail attached hereto and incorporated herein as Bates # 27-29.)

18.    Mr. Hidalgo's e-mail specifically stated:

> I do not believe that I ever collected any information or medical records from the hospital(s) where the incidents of his alleged misconduct or malpractice took place. (See, true copy of said e-mail attached hereto and incorporated herein at Bates # 29)

19.    Indeed, only well after the OCR LOF issued alerted the Woodfields to the apparent

malfeasance on the part of the OCR, Dr. Woodfield made appropriate inquiries to each of

his involved medical providers inquiring whether said providers ever were asked to or

provided copies of his pertinent medical records to the OCR and in each instance Dr.

Woodfield was informed that they had not forwarded such records to the OCR.

20.    Moreover, OCR never evidently acquired records from or questioned anyone at the

OBME; Holy Rosary Hospital in Ontario, Oregon, where the push by Dr. Woodfield's

"colleagues" to label him with some sort of addiction originated (by whom it was

presumed and insisted upon that an addiction problem was the only possible explanation

for his claimed irritable behavior); or MMH in Rexburg, Odaho, where Dr. Woodfield

was proctored by his only two competitors in the town, which proctoring – upon

information and belief – was deliberately instigated by communications from the ISBM,

all as further detailed below.

21.    The subject OCR LOF makes reference to "alcoholism" and "addiction" in a manner which distinctly gives the impression that same had been diagnosed, instead of clarifying that although there were suggestions within Dr. Woodfield's records that Dr. Woodfield exhibited the "behavior of a dry drunk" and an "addictive personality," the eventual psychiatric diagnosis Springbrook Institute Alcohol and Drug Rehabilitation Center (hereinafter: "Springbrook") in Newberg, Oregon rendered was "organic dementia," which was thereafter modified to "organic brain syndrome."

22.    Notwithstanding the foregoing, the OCR LOF stated: On March 26, 1990, the neurologist submitted medical information to the complainant's insurance company. The diagnosis given was "organic brain syndrome." This diagnosis remained during the entire time the complainant was on medical disability. (See, September 23, 1994, OCR LOF, p. 3, par. 3 at Bates # 4)

23.    Furthermore, OCR left out details (of which they were aware from Dr. Woodfield's very first letter of complaint) (See, Bates # 30-43), such as the fact that Dr. Woodfield's health insurer, Blue Cross/Blue Shield of Oregon refused to pay for his month-long stay at Springbrook Institute. Blue Cross/Blue Shield of Oregon wrote in a letter to Dr. Woodfield dated April 23, 1990:

> Following review of the hospital records with Medical Counsel, we were unable to document the medical necessity of this admission. There is no evidence of alcoholism or substance abuse for five years, and therefore no justification for residential services. Springbrook Institute is licensed by the state of Oregon to provide residential alcohol & chemical dependence treatment. This facility is not eligible to provide inpatient/ residential psychiatric care at this time. Therefore we are unable to extend benefits for this admission. (See, true copy of said Blue Cross/Blue Shield of Oregon April 23, 1990 correspondence attached hereto and

incorporated herein as Bates # 44)

24. Thereafter, in reply to Dr. Woodfield's correspondence dated May 24, 1990, appealing

Blue Cross/Blue Shield's decision, Blue Cross/Blue Shield responded by correspondence

dated June 8, 1990 from Demaris L. Yates:

> There was nothing in the medical records to indicate treatment was for alcohol
> abuse. (See, true copy of said June 8, 1990 Blue Cross/Blue Shield
> correspondence attached hereto and incorporated herein as Bates # 45)

25. Moreover, Attorney Joseph D. McCollum, Jr. wrote in a letter to ISBM Counsel, Jean

Uranga, dated December 20, 1991 (See, true copy at Bates # 46-49), that he had

"specifically expanded the scope of materials wanted" in the authorizations for release of

Dr. Woodfield's records for his own and Dr. Woodfield's review, and quoted and

attached copies of the two letters from Blue Cross/Blue Shield cited above. OCR quoted

that letter in the LOF.

26. Springbrook repeatedly attempted to bill Dr. Woodfield. In a letter dated March 29, 1991,

Thomas H. Tongue, Dr. Woodfield's Oregon disability attorney, wrote to Springbrook:

> Essentially, the health insurer contends that your facility rendered care or
> services to Dr. Woodfield beyond those authorized to be rendered by a
> 'Facility for the Treatment of Alcoholism and/or Substance Abuse' under
> the Oregon statutes and administrative rules. The scope of services to be
> provided by Springbrook is limited by license and/or the Oregon Drug and
> Alcohol Program Administration. . . It appears to us that Springbrook's
> experience in matters of this nature would have required that Springbrook
> disclose before admission that in other similar situations involving similar
> care and services, insurers had denied coverage. Dr. Woodfield advised me
> that this was not done. . . If Springbrook continues to threaten Dr.
> Woodfield with referral of his account to an outside collection agency, this
> firm will forward the billing statements along with a formal complaint to
> the State Office of Alcohol and Drug Abuse Programs. (See, true copy of

> said 29 March 1991 correspondence attached hereto and incorporated
> herein as Bates #50-51)

27. Springbrook responded to Attorney Tongue's correspondence in a letter dated May 6,
1991:

> The Oregon Board of Medical Examiners requested that we do a thorough,
> inpatient evaluation on Dr. Woodfield. We complied with the Board's request by
> having Dr. Woodfield admitted and evaluated. . . The diagnosis which was finally
> determined came as a result of ruling out chemical dependency. (See, true copy
> attached and incorporated as Bates #52)

28. In fact, the OBME had not requested the evaluation. Ontario, Oregon physicians had

personally sought the evaluation, one of whom was a former member of the OBME

(Augustus Tanaka) and one a newly-appointed member (Fred Stark). The OBME had not

been involved at all until after Dr. Woodfield left Springbrook.

29. After being kept at Springbrook a month, and after Dr. Woodfield had expressed the

intention to leave several times, on February 9, 1990, Gary Jacobsen, the Medical

Director, Christina Peterson, the Consulting Neurologist, Steven Eickelberg, the

Addictionologist, and a Counselor met with Dr. Woodfield and announced that he had

been diagnosed with "organic dementia." They informed him that they felt this

necessitated his quitting his medical practice, and he was then coerced by Steven

Eickelberg to sign a statement to that effect, addressed to the OBME, which included a

release of his "medical" records to the OBME as well. It was as a result of this forced

communication that the OBME became involved. (See, true copy attached and

incorporated as Bates # 54)

30. Dr. Woodfield had a spinal tap done March 15, 1990, ordered by Dr. Christina Peterson,

who never provided Dr. Woodfield with a copy of the report and told him the results had been NORMAL. Although Dr. Woodfield's MRI and EEG were mentioned in the OCR LOF as having been done, the spinal tap was not, so it is left to pure conjecture whether OCR received a copy of said spinal tap report.

31. After leaving Springbrook, Dr. Woodfield began to shut down his medical practice, and in the meantime, without informing him, his diagnosis was changed to "organic brain syndrome," and no one EVER told Dr. Woodfield his diagnosis had been changed from what he was first told February 9, 1990. He only realized that years later through review of the records he obtained.

32. Dr. Woodfield never received a copy of the spinal tap report in all those releases he acquired. It was not until the Woodfields contacted Dr. James Cooper, a Boise, Idaho psychiatrist (whom Attorney Joseph McCollum had retained to review Dr. Woodfield's Oregon records in anticipation of Dr. Woodfield undergoing an evaluation under the Idaho Impaired Physician's Act, which never happened), and asked him to send them a copy of what he had been provided that they first saw the spinal tap report, and then learned in the Fall of 1998 that Dr. Woodfield's intracranial pressures were seriously elevated, indicating "pseudotumor cerebri," known to be caused by hypothyroidism and other endocrinopathies. (See, true copy of said spinal tap report attached and incorporated herein as Bates # 55)

33. However, upon information and belief, the collusive doctors in Ontario, Oregon apparently knew immediately of the switch in Dr. Woodfield's diagnosis because it is

documented in Dr. Woodfield's Creighton University files (a copy of which Dr. Woodfield subsequently obtained from Creighton, where he had done his OB/GYN residency), that Dr. Andrew Peterson (an internist in Ontario, Oregon, who was Chairman of the Special Committee that "investigated" the alleged disruptive behavior which led to Dr. Woodfield's admission to Springbrook) had telephoned Creighton, March 7, 1990 (See, true copy of memorialization of said communications attached and incorporated herein as Bates # 56), with the outright lie that Dr. Woodfield's Oregon medical license had been revoked, and that he had been diagnosed with "organic brain syndrome."

34.    Mrs. Woodfield wrote a letter dated May 1, 1997, to Ronald Copeland, Associate Deputy Director of the OCR Office of Program Operations in Washington, D.C., to whom Dr. Woodfield had submitted his appeal of the OCR LOF, in which she asked:

> [I]f this is not a case of conspiracy, fraud and collusion, how did Dr. J. Andrew Peterson know the eventual "official diagnosis" before Brent [Dr. Woodfield], and what authority did he have to telephone anyone and discuss Brent in this manner? (See, true copy of said May 1, 1997 correspondence at Bates # 57-61.)

35.    Mr. Copeland never replied to Mrs. Woodfield's letter. His associate, Toni Baker, instead, sent a letter dated May 2, 1997 (See, true copy at Bates # 62-63), shutting down any further review of Dr. Woodfield's case by OCR's D.C. offices, without any reference or response to the letters Mrs. Woodfield had faxed to Mr. Copeland the day before and on April 9, 1997.

36.    Dr. Woodfield's "medical" records generated at Springbrook were all stamped with Federal Regulation (42 CFR Part 2) Disclosure Prohibition Notices prohibiting disclosure or dissemination of any of the contents. Dr. Andrew Peterson could have been

prosecuted for violating said statutory prohibitions, but the Woodfields' expressed dire concerns went unheeded.

37.     Dr. Woodfield's Creighton file further documents that Dr. Peterson was called back March 13, 1990 (See, Bates # 56), for further discussion and his "diagnoses." It was at this time the OBME sent Dr. Woodfield two letters, dated March 9 & 13, 1990 (See, true copies of same at Bates # 64-66), requesting that he appear before the OBME for an "informal interview" April 5, 1990, to discuss his "recent admission to Springbrook and your mental disorder."

38.     Through his attorney at that time, Thomas Tongue, Dr. Woodfield agreed to sign a newly-worded version of what he had been forced to sign at Springbrook. Attorney Tongue wrote a letter to the OBME to the attention of Dave LaDuca, OBME Chief Investigator, dated March 20, 1990, which stated in part:

> Enclosed is the statement requested from Dr. Woodfield confirming that he will not be practicing medicine until he has been cleared by his physician and the Board.

And -

> It is my understanding from talking with your office that upon receipt of this form from Dr. Woodfield that he need not attend the meeting with the Board's investigative committee which is presently scheduled for April 5[th]. (See, true copy of said correspondence at Bates # 67-68)

The OCR LOF stated that:

> On March 26, 1990, the complainant provided the Oregon Board of Medicine with a signed statement in which he agreed not to practice medicine, in any form, until such time as he was cleared by his physician. Based on receipt of this statement, the Oregon Board of Medicine agreed not to suspend the complainant's license to practice medicine in the State of Oregon. (See, September 23, 1994, OCR LOF, p. 3, paragraph 4 at Bates # 4)

40.    The further mishandling of Dr. Woodfield's Complaint by OCR is reflected in the fact that if Dr. Woodfield had not even met with the OBME it was literally impossible for the OCR to conclude that the OBME had "agreed not to suspend his license," when in fact the OBME had only agreed not to proceed with the very first meeting with Dr. Woodfield.

41.    Further, the OCR neglected to clarify that this was a rewritten version of what Dr. Woodfield had been coerced to sign by the doctors before he was allowed to leave Springbrook, February 9, 1990, before the OBME was even involved, before he had legal representation and based on being told his diagnosis was "organic dementia."

42.    The first such document Dr. Woodfield was asked to sign was typed up on Springbrook's letterhead, addressed to Dr. Donald Dobson, Oregon Board of Medical Examiners. The second was typed up on OBME letterhead. The full wording of the 2 documents is as follows:

> Due to a health problem diagnosed at Springbrook Institute in Newberg, Oregon, I am giving up my medical practice. Medical records are being forwarded to you as an explanation.  (Bates # 54)

And -

> I, Brent E. Woodfield, M.D., do agree that I will not practice medicine in any form until such time as I have been cleared by my physician and the Board of Medical Examiners (Bates # 69)

43.    The Oregon Medical Professional Review Organization (hereinafter: "OMPRO"), for whom Dr. Woodfield was a consultant for 3 years, was in part responsible for placing Dr. Woodfield in his untenable position, because one Lori Shortridge, OMPRO Review

Coordinator, pressured him, against his better judgment, to review some cases of Dr. John

Sigurdson, a competitor in Ontario, Oregon, which engendered animosity and conflict.

44.    Dr. Augustus Tanaka, a former OBME member, upon information and belief, was one of

the doctors most actively engaged in efforts to derail Dr. Woodfield's medical career and

also happened to be the Medical Director of OMPRO. He threatened Dr. Woodfield in

the elevator at Holy Rosary Hospital just before the events described above occurred.

45.    The Woodfields also learned later that Dr. Woodfield's Oregon attorney, Thomas

Tongue, was OMPRO legal counsel, on a lucky guess, simply by calling Attorney

Tongue's secretary after seeing OMPRO listed among his firm's "Representative Clients"

in their Martindale-Hubbell listing and asking how long he had been OMPRO's attorney,

to which she responded: "about 10 years."

46.    The OCR LOF falsely stated that:

> He [Dr. Woodfield] applied for hospital privileges, at Madison Memorial
> Hospital, in Idaho, in the latter part of November 1991. . . . The hospital
> granted the complainant temporary privileges, with the stipulation that he
> would be proctored for three months, by two OB/GYN physicians, in order
> to review his surgical skills. The complainant then began practicing
> medicine in the state of Idaho. . . (See, September 23, 1994, OCR LOF,
> page 4, paragraph 5 at Bates # 5)

47.    No proctoring was proposed to Dr. Woodfield until after he had already been practicing

in Rexburg, Idaho. He had signed Memorial Hospital's (hereinafter: "MMH's")

application for privileges, August 26, 1991 (Bates # 70-75), and joined the medical

practice of a friend from medical school, Jeffrey Zollinger, at Rexburg Medical Center on

Monday, November 11, 1991. He had informed Keith Steiner, MMH's CEO, that he had

been out of practice for 22 months and had been diagnosed with "Attention Deficit Disorder" ("ADD").

48.    As documented in the November 25, 1991 minutes of MMH's Credentials Committee:

> Dr. Woodfield was introduced. He is an OB/GYN practicing in the Rexburg Medical Center. His credentials were reviewed and a motion made and approved to accept him into the Medical Staff as an associate member. (Bates # 76)

On November 4, 1991 Dr. Woodfield's treating psychiatrist in Salt Lake City, Utah, William Kuentzel, wrote to Keith Steiner not only clearing Dr. Woodfield's return to work, but further opining:

> Regarding his personal character, I should think any hospital staff would be glad to have him aboard. (Bates # 77)

Indeed, in May 1994, William Kuentzel wrote Dr. Woodfield a lengthy letter in which he told Dr. Woodfield how much he valued having known him and that he, Dr. Kuentzel, had learned from him.

49.    MMH had had no plans to monitor Dr. Woodfield as is substantiated in the identical letters sent out by Keith Steiner dated September 6, October 1 & 7, 1991, seeking references on Dr. Woodfield (eight to medical facilities, three to prior colleagues, all worded exactly the same). Each such letter specifically stated:

> When Dr. Brent E. Woodfield begins practice here, he will not be subject to any special supervision. (Bates # 78)

50.    Thereafter, in his December 9, 1991 letter to ISBM Director Donald Deleski, Keith Steiner wrote:

As a follow-up from your telephone call the other day expressing concerns regarding the privileging of Dr. Brent Woodfield in Idaho, we contacted the Executive Director of the Oregon State Board of Medicine to get his advice and input.

After reviewing the matter, we realized that information apparently on record in Oregon is confidential and has not had any official action taken.

And –

We feel we have done a very thorough review on our end, in relationship to credentialing and have placed Dr. Woodfield on a probationary status for a period of six months for evaluation. (Bates # 79-80)

51.    On May 8, 1992, said Mr. Steiner wrote to Attorney Joseph McCollum:

In the April Medical/Credentials meeting of the Madison Memorial Hospital Medical Staff, the committee concluded that the application of Dr. Woodfield is incomplete since we have information that Dr. Woodfield was treated at the Springbrook Hospital in Oregon. . . . Dr. Woodfield received temporary privileges on November 9, 1991 and provisional staff privileges for a period of six months beginning December 11, 1991. It was after this period of time that we found out that he had been institutionalized at the Springbrook facility. We feel this information is necessary in order to complete the application . . . (See, true copy of said May 8, 1992 correspondence at Bates # 81-82).

52.    In light of the timing and letters cited above – upon information and belief – it had to

have been communication(s) from Donald Deleski to Keith Steiner which instigated the

proctoring undertaken by MMH, since MMH had clearly stated in writing that there had

been no proctoring planned and the minutes of the November 25, 1991 Credentials

Committee said nothing about proctoring, monitoring or evaluation of any kind.

53.    Moreover, Dr. Woodfield received 3 hostile telephone calls just as he was resuming

medical practice in Rexburg, Idaho. Dr. Tim Kable at Creighton University in Omaha,

Nebraska called Dr. Woodfield at home in Rexburg, Idaho on Saturday, November 9,

1991, verbally accosting Dr. Woodfield about his Oregon diagnoses and resumption of

practice. Yet, curiously, Dr. Kable had written a response to MMH's inquiry, dated November 8, 1991 (Bates # 83), the day before he telephoned Dr. Woodfield, citing no concerns or problems. Dr. Kable documented his November 9, 1991 (Bates # 84) telephone call in handwritten notes included in Dr. Woodfield's records acquired from Creighton University. (Bates # 84)

54. Dr. Woodfield also received angry telephone calls while at work from Donald Deleski, Executive Director of the ISBM and John J. Ulwelling, Director of the OBME. They both expressed a great deal of animosity regarding his resumption of medical practice and insisted he re-test. Dr. Woodfield's recollection is that at least one of these other two phone calls was within a few days of Dr. Kable's call on 11/09/91; he believes it was on his first day of resuming practice, November 11, 1991.

55. Upon information and belief the proctoring at MMH was instigated with malice by the ISBM, with the calculated intent of securing the proctoring notes to use against Dr. Woodfield later if he did not agree to the "informal evaluation" by the psychologist the ISBM chose to employ. OCR could and should have ascertained whether this was so or not. ISBM counsel, Ms. Jean Uranga, knew she would be able to get the proctoring notes due to the phrase "submission to monitoring" then in I.C. the Idaho Code § 39-1393:

> The medical staff of any licensed acute care hospital in this state shall promptly notify the board of medicine of all disciplinary actions and revocations or reductions of privileges imposed upon any physicians and surgeons licensed to practice medicine and surgery in Idaho, as respects his or her practice in or as a member of the medical staff of such hospital, including voluntary or involuntary reduction in medical staff privileges or submission to monitoring by the medical staff of the physicians' physical condition or delivery of medical services.

OCR had the legal ability to ascertain the truth on Dr. Woodfield's behalf, yet – without justification – made no effort to do so.

57.    The Woodfields have documented numerous conflicting statements by the OBME concerning the status of Dr. Woodfield's Oregon medical license, depending upon the source of the inquiry. Sometime in late Summer of 1991, when he was still in Utah, Dr. Woodfield had arranged an appointment with the office of the Director of Licensing in Utah to ask if he could get a license there that would allow him to assist in surgery to supplement his disability income. His disability policy with Paul Revere Insurance Company allowed it, so Dr. Woodfield realized he should try, since all of his medical bills were becoming a problem. After he made the appointment, he was told he could return to work by Sue Hagen and Bill Kuentzel, but decided to go to the appointment anyway to inquire  about his plans for returning to work in Idaho.

58.    Accordingly, Dr. Woodfield met with a Utah Licensing Representative, outlined what had happened up to then, and related the history of his misdiagnoses. He was asked if he had an active license in Idaho, to which he answered "Yes." When asked whether he had had any suspension of hospital privileges in Oregon or anywhere else, Dr. Woodfield responded "No." When asked whether he had been under treatment for alcoholism, Dr. Woodfield said "No" and explained all the circumstances. He explained that Blue Cross/Blue Shield had refused to pay the $12,000.00 Springbrook Institute bill since he had not been treated for alcoholism, and that, accordingly, he had never paid the Springbrook bill. The Utah Licensing Representative then called the OBME office in Dr.

Now, pursuant to the amended I.C. § 39-1393 (See, Bates # 85-103), Board counsel can no longer demand release of peer review records when there has been no negative action taken against the physician.[1]

56. The Woodfields have made numerous inquiries in an attempt to find out what Mr. Deleski and/or Ms. Uranga communicated to MMH to compel MMH to initiate proctoring. Dr. Woodfield documented one effort in a letter he wrote to Attorney Joseph McCollum, dated May 26, 1994:

> Somebody has disseminated something about me from somewhere which is turning my future hope for a "normal" life into a dung heap. I called Keith Steiner yesterday, and asked him directly if Jean Uranga had ever called him on the telephone. His response was evasive from "I don't recall." to "May be once, twice, or three times". He didn't recall any substance to these "conversations". "It was a long time ago", he said. He indicated that he referred their request for proctoring notes to "counsel", and he, Dean Dalling, took care of it. I asked him if Jean Uranga had volunteered other information about me over and above any petition for proctoring notes. He answered that he would only discuss such information through an attorney. (Bates # 104-105)

---

[1] Idaho Senate Bill 1102a, which repealed I.C. § 39-1393, NOTIFICATION OF PROFESSIONAL REVIEW ACTION IMPOSED UPON PHYSICIAN, and amended with a totally new section, was signed into law April 8, 2003, by Governor Kempthorne. Same provides: "A health care organization in Idaho shall report to the board of medicine if it . . ." and proceeds to list all circumstances under which they must submit a report to the ISBM, and further provides: (6)(c) . . . However, the board of medicine may not request or require production of any peer review records from any person or health care organization, including the identification of which particular patient care records were selected for, or reviewed, examined or discussed in any peer review activity of a health care organization, or the method used by the health care organization to select such patient care records for peer review. (7) The records **lawfully** requested by the board of medicine pursuant to subsection (6) of this section shall be provided by the health care organization without a subpoena or court order. If the health care organization fails to comply with the board of medicine's **lawful** request, the board may petition the district court for an order compelling compliance with the board's request, which may be granted **if disclosure is required by law**."

Woodfield's presence. He asked the OBME what the status of Dr. Woodfield's license was and they told him it was active and unencumbered. When he asked them whether Dr. Woodfield had any physical problems that would stop him from practicing, they told him that Dr. Woodfield had an active and unencumbered license, and that was all they could tell him. After the call was over, said Representative said that he was not going to "push it" and advised Dr. Woodfield to just apply for hospital privileges in Idaho, and "leave Oregon alone."

59.    Ron Holman, the Business Manager of Rexburg Medical Center and Jeffrey Zollinger, Dr. Woodfield's partner there, both told Dr. Woodfield that MMH and Rexburg Medical Center had also contacted the OBME before he started work there and that the OBME had told them that he had an active, unencumbered license in Oregon.

60.    The State of Oregon then renewed Dr. Woodfield's Oregon medical license in December, 1991 through December 31, 1993 as active and unencumbered with full knowledge that Dr. Woodfield was in practice in Idaho.

61.    Dr. Woodfield wrote to Ronald Copeland on January 8, 1995 (See, true copy of January 8, 1995 correspondence at Bates # 106-117) after the Woodfields had taped a Phil Donahue Show Friday, December 16, 1994, which first aired February 10, 1995, to complain about the ISBM faxing their complaints to Donahue's producer. He wrote that Keith Steiner, CEO at Madison Memorial, received a letter, dated July 17, 1992, from Dave LaDuca, Investigator for the OBME. Mr. LaDuca sent a copy of the agreement Dr. Woodfield had signed for the OBME and wrote:

> Please review the license verification data and the attached copy of the
> signed agreement dated March 26, 1990. The agreement is still in effect
> and has not been rescinded by the Oregon Board of Medical Examiners.
> (Bates # 110)

In that same letter, Dr. Woodfield quoted an August 19, 1993, article in the Idaho Falls Post
Register about the revocation of his medical license:

> The Oregon medical board has no record of any complaints or disciplinary
> action against Woodfield during his time in Oregon, said chief investigator
> David LaDuca. (Bates # 113)

62.    Several boards of medicine have web-sites through which information on physicians
       licensed in their states can be accessed. The Woodfields have been monitoring the
       OBME site since they first discovered it, checking from time to time on the information
       posted about Dr. Woodfield and all the doctors involved in his case. When Mrs.
       Woodfield first found the site and checked said information on January 26, 1999 (Bates #
       118), it indicated:

       "PENDING ACTION. CONTACT BOARD FOR DETAILS"

63.    The next time Mrs. Woodfield checked the information posted, it indicated that Dr.
       Woodfield's license had lapsed due to non renewal but that the standing was:
       "UNRESTRICTED".

64.    Then, for approximately two years there was no information posted regarding Dr.
       Woodfield. When Mrs. Woodfield checked again on March 17, 2001, correct
       information was posted, which has remained since. At one point Mrs. Woodfield called

the OBME offices and spoke with the Chief Investigator, Dave LaDuca, confronted him

about the false information they had posted about Dr. Woodfield on their web-site, asked

him if it was not customary for a Board of Medicine to notify physicians some point

before an action against them could be "pending," and informed him that the Woodfields

had no knowledge of any such "pending action." For a long while they had no profiles

posted for Drs. Gus Tanaka or Kent Neff, which they do now.

65.    Dr. Woodfield concluded his January 8, 1994 letter to Mr. Copeland as follows:

> So, instead of taking arms against this formidable sea of troubles and facing the
> original mistake, Oregon has decided to go underground to stop me from
> practicing, i.e., bury me. Every minute I practice and every place I practice
> become unfortunate incitements against them. Nobody likes to be uncomfortable.
> Thus, lack of knowledge, inability to perceive what is real, and spiritual inertia
> makes cowards of us all. Pale thinking will not solve the problem. I have become
> the problem. My existence as a breathing, thinking and, especially, working,
> person is one human enterprise that, according to some, must lose the name of
> action. This vicious pursuit of self preservation can only end in disaster. I think
> that Dr. Estes is wrong. The inability to accept and to deal with "bad doctors" is
> more of a threat to the profession than exposing and destroying them. "To be or
> not to be, that is the question". I hope to show him that, if he doesn't learn it on
> his own! From my own vista, I don't have much to lose, and I do have a lot to
> gain, not all of it material, either. (Bates # 117)

66.    On June 16, 1994 Dr. Woodfield wrote (a 16-page letter) to Mr. Hidalgo, after a

distressing telephone conversation in which Mr. Hidalgo expressed skepticism about Dr.

Wood-field's complaints of discrimination against the ISBM and said that the evidence

seemed "circumstantial" (See, true copy of June 16, 1994 correspondence at Bates #119-

134). After many elapsed months the Woodfields began to fear that OCR had done no

real investigation. Dr. Woodfield thereby attempted to alert Mr. Hidalgo to the

magnitude of the apparent misunderstandings and deception involved, pleading with him

to go out and round up all the evidence:

> Joe McCollum, my attorney, and I met with Jean Uranga, Board
> attorney, and Don Deleski, head of the Idaho Board, around
> 12/18/91 to "discuss" the disability issue. Ms. Uranga started off
> the meeting yelling at me. She demanded that I retest. I refused to
> retest from the outset. The malpractice in Oregon, as I have
> mentioned, started off with a psychologist's mistakes. How could
> Ms. Uranga, an attorney, demand any such thing before she had
> even heard from my current personnel physician? Her aggressive
> approach was reminiscent of a telephone conversation I had had
> with John Uwelling, the Head of the Oregon Board of Medicine, in
> early December of 1991. He interrupted my clinic schedule at
> Rexburg Medical Center calling and asking about my "retesting". I
> told him I had found that I just had ADD, and that the misdiagnosis
> in Oregon had been made on the basis of the "testing" alone, which
> was inappropriate. He came across with the same ignorant hysteria
> as Uranga in that first meeting. Might he be the source of the
> "unofficial phone information" that started all this? I cannot
> determine that on my own. It is within your powers with the Office
> for Civil Rights. (p. 2) (Bates # 120)

And -

> Oregon has done nothing to my license, yet has continued to accept
> the fees to maintain that license as long as I do not practice in their
> state, but someone up there has been calling around, following me
> with the misdiagnosis and perpetuating this disaster, and that's
> where we need to investigate back to, the source, or this could
> conceivably follow me around indefinitely! Someone wants to
> cover the whole outrageous debacle up! (p. 15) (Bates # 133)

67.    Notwithstanding Dr. Woodfield's above-described efforts to remind OCR of its

"investigation" duties and responsibilities, OCR plainly and egregiously chose to ignore

Dr. Woodfield. Accordingly, Mrs. Woodfield wrote to Ronald Copeland, Associate

Deputy Director, Office for Civil Rights, on April 9, 1997 (See, true copy of said

correspondence at Bates # 135-140), while the appeal of the OCR LOF was reportedly

still pending and similarly stated:

> We are fervently seeking a thorough investigation this time, including the
> acquisition of all of Brent's records withheld from him thus far and that
> we be provided with complete copies of those records as well. (Bates # 135)

However, the OCR in Washington, DC also ignored the Woodfields' heartfelt pleas for relief.

68. The proctoring notes and Dr. Woodfield's written response had been reviewed by the

doctors at MMH after which the hospital made the determination that no actions against

Dr. Woodfield's hospital privileges were warranted. His proctoring was discontinued and

the hospital's only concern became gaining access to the information in his records from

Oregon.

69. The ISBM instigated the proctoring at MMH in the first place, then requested the

proctoring notes from the hospital even though no negative action had been taken by the

hospital.

70. In a telephone conversation on January 9, 1995 with Attorney Joseph McCollum, in

which he was relating the details of a meeting concerning the "procedure by which the

State Board of Medicine attempts to obtain information from hospitals for licensure

prosecution purposes" (which included Dr. Michael Estes as Head of the Idaho Board of

Professional Discipline and Attorney Joseph McCollum as Counsel for the Idaho Hospital

Association), Attorney McCollum told the Woodfields:

> [T]he issue that people saw as the quirky one in our case was the
> use of proctoring records, not peer review records, but proctoring
> records, as a basis for recommendation of discipline on the grounds
> that someone is not complying with the recognized local standard

> of practice. And, I think that is an Achilles' heel for this particular
> type of prosecution from the national perspective . . .

71.    Had OCR properly gathered records from MMH and interviewed even just those involved

there with Dr. Woodfield's case, the OCR could and would have found out that the

hospital had determined that no action against Dr. Woodfield was warranted because they

could have acquired and reviewed all the records there.

72.    Moreover, the OCR could have well also discovered the evidence of corruption and fraud

concerning Count 10, the sexual allegation, which Mrs. Woodfield addressed in her

March 18, 2003 letter to Idaho Attorney General Lawrence Wasden, which evidence was

intentionally kept out of the hearing record in Dr. Woodfield's case by the ISBM, and

thus never considered by the ISBM, the Hearing Officer or Idaho Fourth District Court

Judge D. Duff McKee, whose decisions were both overwhelmingly in Dr. Woodfields

favor, with the exception of the "ethical" component of Count 10 and two clinical counts

for which accurate information was also intentionally withheld by ISBM counsel.

73.    On October 21, 1994 Dr. Woodfield wrote a letter to Ronald G. Copeland, Associate

Deputy Director, Office for Civil Rights, appealing the OCR Region X LOF to OCR

headquarters in Washington, D.C. He received a letter from that office, dated January 9,

1995 ) (true copy at Bates # 141), signed by Kathleen A. O'Brien (for Toni T. Baker):

> We are in receipt of your letter in which you challenge the decision made
> by our regional office in the above referenced case. Immediately following
> our assessment of relevant case documents, we will inform you of our
> decision about your request for an administrative review.

Ronald Copeland wrote a letter to Dr. Woodfield dated September 10, 1996  (true copy at

Bates # 142), which said in its entirety:

> After further review of your request for administrative review in the above referenced complaint, the Office for Civil Rights (OCR) will defer any action in this case until after the ongoing administrative and/or legal appeals at the State level have been exhausted. Please advise us of any changes in the status of your case. OCR reserves the right to review the final disposition of the State action to ensure it accords with OCR standards. Based upon it's review, OCR will then determine whether further action is necessary.

74.    No review of the final disposition of the Idaho action was ever made as highlighted in Mrs. Woodfield's March 18, 2003 correspondence to the Idaho Attorney General, Lawrence G. Washen (true copy at Bates # 143-144). Nor did OCR ever – upon information and belief – make any effort to ensure that Dr. Woodfield's civil and due process rights were protected.

75.    Indeed, by its very negligence as detailed herein, it is respectfully submitted that the Region X OCR proximately caused the literal destruction of Dr. Woodfield's resurgent professional career and livelihood and engendered ongoing, profound emotional and psychological distress, pain and suffering, acute humiliation, and, has further severely impaired the Woodfields' general quality of life throughout the past seven (7) years and certainly for the presently apparent foreseeable bleak future.

76.    On December 3, 2003 Dr. and Mrs. Woodfield, the Plaintiffs herein, submitted a Department of Justice Standard Form 95 Claim based upon – *inter alia* – the allegations herein claiming property damage in the sum of $2,143,198.38 together with personal injury (pain and suffering/emotional distress) damages in the sum of $900,000.00, or, a claim for damages in the total sum of $3,043,198.38.

77.   By June 3, 2003 the DHHS had neither accepted nor rejected the Claim and, pursuant to

28 USCS Section 2675(a), the Plaintiffs elected to consider said failure to act as a final

denial of their Claim. All required notices have been given, and all conditions precedent

to suit have been complied with by the Plaintiffs.

<u>COUNT I - NEGLIGENCE</u>

78.   The Plaintiffs repeat, reallege and incorporate by reference each and every allegation

contained in Paragraphs 1 through 77 with the same force and effect as though set forth

herein.

79.   As complained of herein, although charged by law to properly, fairly and reasonably

investigate the discrimination claim adduced by the Claimants/Plaintiffs, Dr. and Mrs.

Woodfield, the Defendant, the United States of America by its agents, employees and

other representatives for whose conduct it is responsible at law was both omissively and

commissively negligent and its negligent actions or failures to take proper actions

included – <u>but are not necessarily limited to</u> – the following:

A.   Failure to properly acquire all pertinent medical and/or administrative

and/or all other relevant records;

B.   Failure to interview all and/or crucial material witnesses with relevant

knowledge pertaining to Dr. Woodfield's career and any/all actions taken

by any/all empowered administrative agencies, boards, bodies or entities

concerning his professional actions, conduct, licensure and/or status and

disposition;

C.  Failure to contact all appropriate officials and work within the DHHS system to effectuate a proper, thorough and unbiased investigation in the interests of fundamental fairness and justice;

D.  Failure to frame issues properly in the LOF;

E.  Failure to render a fair, just, complete or corroborated decision due to inherent failure to acquire all the facts required for an impartial, informed and balanced decision; and,

F.  Failure to actually corroborate, document and/or elucidate key points set forth as conclusory statements in the LOF.

80.  As the direct and proximate result of the negligence of the Defendant, all as complained of herein in detail, the Plaintiff, Dr. Woodfield, has sustained an egregious, totally unnecessary and irreparable loss of his career as an OB/GYN and has further suffered mental anguish, emotional and psychological distress all as originally set forth in his December 3, 2003 Claim to the DHHS in the total sum of $3,043,198.30.

WHEREFORE, the Plaintiff demands judgment against the Defendant in the amount of $3,043,198.30 together with interest and all costs of this action.

## COUNT II - NEGLIGENCE

81.  The Plaintiff, Lisa W. Woodfield, is the wife of the Plaintiff, Dr. Woodfield, realleges and incorporates by reference each and every allegation contained in Paragraphs 1 through 80 with the same force and effect as though fully set forth herein.

82.    As the direct and proximate result of the negligence of the Defendant as hereinabove set

forth in detail, the Plaintiff, Dr. Woodfield, has been caused critical and permanent

property loss and emotional distress, pain and suffering for the balance of his life, and, as

a direct and proximate result thereof the Plaintiff, Mrs. Woodfield, has been caused to

suffer and will continue to suffer the ongoing permanent loss of her husband's otherwise

normal and usual society, companionship, care, protection, assistance, advice, consortium

and the intimate relationship and/or the critical impairment thereof for the balance of Mrs.

Woodfield's life.

WHEREFORE, the Plaintiff, Mrs. Wooodfield, demands judgment against the Defendant

in the amount of $450,000.00.

## COUNT III - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

83.    The Plaintiff repeats, realleges and incorporates by reference each and every allegation

contained in Paragraphs 1 through 82 with the same force and effect as though set forth

herein.

84.    As the direct result of the Defendant's abusive, willful, callous, unfair, deceptive,

outrageous and intentionally misleading conduct complained of herein, the Plaintiff, Dr.

Woodfield, has inescapably suffered extreme and marked emotional and physical distress

and the loss of an irreplaceable career as a successful OB/GYN physician.

WHEREFORE, the Plaintiff demands judgment against the Defendant in the amount of

$3,043,198.30 together with interest and all costs of this action.

## COUNT IV - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS/
## LOSS OF CONSORTIUM

85.    The Plaintiff, Lisa W. Woodfield, is the wife of the Plaintiff, Dr. Woodfield, and repeats,

reic alleges and incorporates by reference each and every allegation contained in Paragraphs

1 through 84 with the same force and effect as though fully set forth herein. As the direct

and proximate result of the negligent infliction of emotional stress of the Defendant upon

the Plaintiff, Dr. Woodfield, Dr. Woodfield has been caused critical and permanent

property loss and emotional distress for the balance of his life and, as a direct and

proximate result thereof the Plaintiff, Mrs. Woodfield, has been caused to suffer and will

continue to suffer the continuing and permanent loss of her husband's otherwise normal

and usual society, companionship, care, protection, assistance, advice, consortium and

intimate relationship and/or the critical impairment thereof for the balance of Mrs.

Woodfield's life.

WHEREFORE, the Plaintiff, Mrs. Woodfield, demands judgment against the Defendant

in the amount of $450,000.00.

## COUNT V - UNLAWFUL/TORTIOUS INTERFERENCE WITH
## ADVANTAGEOUS OR CONTRACTUAL RELATIONSHIP

86.    The Plaintiffs repeat, reallege and incorporate by reference each and every allegation

contained in Paragraphs 1 through 85 with the same force and effect as though fully set

forth herein.

87.    As a result of the Defendant's knowing, intentional and improper interference with the
       Plaintiff's contractual or other economic relationship with his prior and prospective
       employers resulting in acute career and monetary loss and damages to the Plaintiff, Dr.
       Woodfield, and clear interference with the Plaintiff's, Dr. Woodfield's, prospective
       economic relationships with said prior employer and prospective employers and career
       potential, the Plaintiff, Dr. Woodfield, has suffered both monetary and emotional distress
       damages as a direct result of said Defendant's effective, willful and unlawful interference
       with the Plaintiff's, Dr. Woodfield's, contractual relations.

       WHEREFORE, the Plaintiff, Dr. Woodfield, demands judgment against the Defendant in
the sum of $3,043,198.30 together with interest and all costs of this action.

## COUNT VI - INTERFERENCE WITH CONTRACTUAL RELATIONS/
## LOSS OF CONSORTIUM

88.    The Plaintiff, Lisa W. Woodfield, is the wife of the Plaintiff Dr. Woodfield, and repeats,
       realleges and incorporates by reference each and every allegation contained in Paragraphs
       1 through 87 with the same force and effect as though fully set forth herein.

89.    As the direct result of the Defendant's knowing, intentional and improper interference
       with the Plaintiff's contractual or other economic relationship with prior and potential
       employers and his career potential resulting in acute monetary loss and damages to the
       Plaintiff as further described above, the Plaintiff, Dr. Woodfield, has been caused critical
       monetary and career and property losses and emotional pain and suffering for the balance
       of his life, and, as the direct and proximate result thereof the Plaintiff, Mrs. Woodfield,

has been caused to suffer the continuing and permanent loss of her husband's otherwise normal and usual society, companionship, care, protection, assistance, advice, consortium, intimate relationship and/or critical impairment thereof for the balance of Mrs. Woodfield's life.

WHEREFORE, the Plaintiff, Lisa W. Woodfield, demands judgment against the Defendant, the United States of America, in the amount of Four Hundred Fifty Thousand Dollars ($450,000.00) together with interest and all costs of this action.

## COUNT VII - VIOLATION OF STATE AND FEDERAL CIVIL RIGHTS

90.    The Plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 89 with the same force and effect as though fully set forth herein.

91.    The tortious conduct of the Defendant as complained of at length and in detail herein inflicted a direct, catastrophic and irreversible harm upon not only the Plaintiff's, Dr. Woodfield's, career as a physician, but also resulted in severe concomitant emotional distress and psychological pain and suffering in violation of Dr. Woodfield's Civil Rights as secured and protected by the United States Constitution and the Massachusetts Civil Rights Act, Chapter 12, §§ 11H through I.

92.    As the direct and proximate result of the fundamentally unfair treatment inflicted upon Dr. Woodfield in violation of both his United States and Commonwealth of Massachusetts Civil Rghts, Dr. Woodfield has suffered extreme property losses and emotional distress without being afforded the fundamentally fair procedures guaranteed

by said Constitutions and further was denied both substantive and procedural due process.

WHEREFORE, the Plaintiff, Dr. Woodfield, seeks hereby his property loss and emotional distress damages in the sum of Three Million Forty-Three Thousand One Hundred Ninety-Eight Dollars and Thirty Cents ($3,043,198.30), and, in addition, given that his Civil Rghts were violated, he seeks all attorney's fees and costs of this action as may be allowed by the U.S. Constitution and/or the Massachusetts Civil Rights Act and as deemed appropriate by this Court.

## VIII - VIOLATION OF CIVIL RIGHTS/LOSS OF CONSORTIUM

93.    The Plaintiff, Mrs. Woodfield, is the wife of the Plaintiff, Dr. Woodfield, and repeats and realleges as part of this Count each and every allegation contained in Paragraphs 1 through 92 with the same force and effect as though fully set forth herein.

94.    As the direct and proximate result of the tortious conduct of the Defendant in violation of the United States Constitution and the Massachusetts Civil Rights Act as hereinabove set forth in detail, the Plaintiff, Dr. Woodfield, has been caused critical property losses and emotional distress and psychological pain and suffering for the balance of his life, and, as the direct and proximate result thereof the Plaintiff, Mrs. Woodfield, has been caused to suffer the continuing and permanent loss of her husband's otherwise normal and usual society, companionship, care, protection, assistance, advice, consortium and intimate relationship and/or the critical impairment thereof for the balance of Mrs. Woodfield's life.

WHEREFORE, the Plaintiff, Lisa W. Woodfield, demands judgment against the

Defendant, the United States of America, in the amount of Four Hundred Fifty Thousand Dollars

($450,000.00) together with attorney's fees, interest and all costs of this action.

Plaintiffs, Dr. and Mrs. Woodfield,
By their Attorney,


Anthony R. Bott
BBO # 050540
Anthony R. Bott, P.C.
Eight Beach Road
P.O. Box 1137
East Orleans, MA 02643
(508) 240-2700

Dated: November 24, 2004

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

BRENT E. WOODFIELD, M.D. and
LISA W. WOODFIELD

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Barnstable,
(EXCEPT IN U.S. PLAINTIFF CASES)   MA

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Anthony R. Bott, P.C.   (508) 240-2700
Eight Beach Road, P.O. Box 1137,
East Orleans, MA 02643

### DEFENDANTS

UNITED STATES OF AMERICA

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

ATTORNEYS (IF KNOWN)   U.S. Attorney: Michael J. Sullivan
U.S. Courthouse, Suite 9200
1 Courthouse Way
Boston, MA  02210

04 12483 NMG

## II. BASIS OF JURISDICTION   (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☒ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

### CONTRACT
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

### REAL PROPERTY
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

**PERSONAL INJURY**
☐ 362 Personal Injury — Med. Malpractice
☐ 365 Personal Injury — Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

### CIVIL RIGHTS
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

### PRISONER PETITIONS
☐ 510 Motions to Vacate Sentence
**HABEAS CORPUS:**
☐ 530 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

### FORFEITURE/PENALTY
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

### LABOR
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

### BANKRUPTCY
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

### SOCIAL SECURITY
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS – Third Party 26 USC 7609

### OTHER STATUTES
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities/Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☒ 890 Other Statutory Actions

## VI. CAUSE OF ACTION   (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

This Federal Tort Claims Act, 28 U.S.C. § 2671, et seq. action seeks damages for Dr. Woodfield's loss of licensure, his invaluable career as a physician and the pain and suffering caused to him and his wife, Lisa Woodfield, due to the negligence of the Defendant.

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

**DEMAND $**
$3,043,198.30

**JURY DEMAND:**   ☐ YES   ☒ NO
CHECK YES only if demanded in complaint:

## VIII. RELATED CASE(S)   (See instructions):
IF ANY

JUDGE _____   DOCKET NUMBER _____

DATE   November 24, 2004

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY)___Brent E. Woodfield, M.D.___

___vs. United States of America___

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL
COVER SHEET.  (SEE LOCAL RULE 40.1(A)(1)).

| | | |
|---|---|---|
| ___ | I. | 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT. |
| X | II. | 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. |
| ___ | III. | 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891. |
| ___ | IV. | 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900. |
| ___ | V. | 150, 152, 153. |

*Also complete AO 120 or AO 121
for patent, trademark or copyright cases

04 CV 12483 NMG

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)).  IF MORE THAN ONE PRIOR RELATED CASE
HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

___No related cases___

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS
COURT?                                                                 YES            (NO)

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE
PUBLIC INTEREST?   (SEE 28 USC §2403)                                   YES            (NO)

IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
                                                                       YES             NO

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE
28 USC §2284?                                                          YES            (NO)

7. DO ALL OF THE PARTIES  IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE
COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"),  RESIDING IN MASSACHUSETTS RESIDE IN THE
SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).                             (YES)            NO

A.      IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?

(EASTERN DIVISION)              CENTRAL DIVISION              WESTERN DIVISION

B.      IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING
GOVERNMENTAL AGENCIES,  RESIDING IN MASSACHUSETTS RESIDE?

EASTERN DIVISION               CENTRAL DIVISION              WESTERN DIVISION

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME ___Anthony R. Bott, Esq.  BBO # 050540___
ADDRESS ___Eight Beach Road, P.O. Box 1137, East Orleans, MA  02643___
TELEPHONE NO. ___(508) 240-2700___

(Cover sheet local.wpd  - 11/27/00)